# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| BUD GASKIN, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Case No. CV611-028 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Claimant Bud Gaskin, a 56-year-old former painter (tr. 157, 185), sought social security disability benefits due to knee and shoulder problems. (Tr. 13-14.) His claim was denied initially and on reconsideration. (Tr. 89-92 (initial denial) & 96-99 (reconsideration denial).) Thereafter, he requested a hearing before an Administrative Law Judge ("ALJ"). After a hearing on September 17, 2009, the ALJ entered an order denying Gaskin's benefits application. (Tr. 10-20.) The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.) Gaskin then filed a complaint for judicial review in this Court, contending that the ALJ

erred in reaching his decision.    For the reasons set forth below, the Commissioner's decision denying benefits should be **AFFIRMED**.

## I.    STANDARD OF REVIEW

Affirmance of the ALJ's decision is mandatory if his conclusions are supported by substantial evidence and based upon an application of correct legal standards.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is something more than a mere scintilla, but less than a preponderance."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted).  It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted).  If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings."  *Id.* at 1158-1159.  This Court cannot substitute its judgment for that of the Commissioner.  *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant.  20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To determine whether he has met his burden of proof, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  At step one, the claimant must prove that he has not engaged in substantial gainful activity.  *Jones*, 190 F.3d at 1228.  At step two, he must demonstrate a severe impairment or combination of impairments.  *Id*.  Then, at step three, if the claimant's impairment meets or equals a listed impairment (*see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1), he is automatically found disabled.  *Id*.  If not, he must advance to step four, which requires him to prove an inability to perform past relevant work.  *Id*.  If he cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Id*.

## II.   ANALYSIS

### A.   The ALJ's Determination

At step one of the five-step process, the ALJ found that Gaskin had not engaged in substantial gainful activity since May 13, 2007.  (Tr. 13.) At step two, he found that Gaskin's only severe medical impairments were related to damage to his knees, both of which had been totally replaced.  (Tr. 13-14.)  The ALJ discounted Gaskin's claim that he suffers pain and stiffness in his right shoulder; any shoulder injury was non-severe, since Gaskin had not offered any medical evidence showing that his shoulder trouble originated prior to his last insured date, December 31, 2007.  (Tr. 14.)  Then at step three, the ALJ found that claimant failed to meet any of the listings found in 20 C.F.R. Pt. 404, Subpt. P, App'x 1.  (Tr. 14.)

Turning to step four, the ALJ found that claimant could not return to his prior employment as a painter but that he retained the residual functional capacity to perform light work with a few caveats: no running, jumping, or climbing.  (Tr. 18, 14-15.)  Although claimant retained the capacity sit, push, and pull for an unlimited amount of time in an eight hour day, he could only walk for two hours a day, lift twenty pounds

4

occasionally, and could climb for no more than a third of an eight hour workday.   (Tr. 15.)   He should also work in a non-hazardous environment due to his lack of mobility and balance. (*Id.*)

The ALJ also spent some time discussing Gaskin's pain.  According to Gaskin, he can only sit for half an hour before getting up and moving about. (Tr. 16.) He said that he must elevate his legs and apply heat and ice with regularity in order to avoid taking pain medication. (*Id.*)  The ALJ acknowledged that Gaskin's bilateral knee replacement could cause such symptoms, but he found that the medical evidence cut against him. (*Id.*)   For instance, just six weeks after undergoing a total knee replacement, his orthopedic surgeon, Dr. Scott Duffin, noted that Gaskin was neurologically intact, could walk up to three miles a day, and was otherwise healing well and only occasionally experiencing pain.  (*Id.*) During and after his recovery, Gaskin even helped out quite a bit around the house.  While he did not mop or vacuum, he occasionally cooked meals, swept, helped with the laundry, and mowed the lawn (using a riding lawn mower). (*Id.*)  Gaskin attempted to resume his old job, but he stopped and reported difficulties to Dr. Duffin; the doctor still noted that Gaskin should be able to perform light work with some restrictions

5

within three months.  (Tr. 17.)  By March 2008, Gaskin reported that he was having no difficulty and was doing well.  (*Id.*)

The ALJ also relied upon a disability questionnaire completed by Dr. Duffin in 2009 stating that Gaskin, during the relevant time period, had no restrictions on repetitive reaching, handling, or fingering, could sit for up to six out of an eight hour work day, could stand and walk for up to two hours a day, and was not required to elevate his legs, use an assistive device to stand or walk, or take any unscheduled breaks during a workday.  (*Id.*)  The state agency doctors similarly opined that Gaskin could perform light exertional work.  (*Id.*)  The ALJ also noted that Gaskin showed no distress after sitting for 50 minutes at the hearing. (Tr. 17-18.)

At step five, the ALJ found, after consulting with a vocational expert, that Gaskin retained the residual functional capacity to work as a gate attendant, a table worker, or a small product assembler.  (Tr. 19.) Consequently, the ALJ found that Gaskin was not under a disability from his May 13, 2007 alleged onset date through his December 31, 2007 last insured date.  (Tr. 19-20.)

6

### B.    Gaskin's Claims

Gaskin contends that the ALJ erred by: (1) improperly classifying him as capable of performing light, as opposed to sedentary, work; (2) posing an incomplete hypothetical to the vocational expert; and (3) depending upon unreliable vocational expert testimony.

### 1.    *Exertional Capacity*

Gaskin claims that he is only capable of sedentary work rather than light work, since he has a limited capacity for standing and walking. (Doc. 7 at 10-11.)  He reasons that under Social Security Rulings ("SSR") 83-10 and 83-12, light work requires standing or walking for approximately six hours in an eight hour workday, but the ALJ, who ultimately concluded that Gaskin could perform light work,[1] noted that

---

[1] Here, "after careful consideration of the entire record," the ALJ found

that, through the date last insured, the claimant's right total knee replacement and degenerative joint disease of the left knee limits him to performing a residual functional capacity of light work as defined in 20 CFR 404.1567(b) except he can never run, jump or climb ladders, ropes, or scaffolding.  He can individually sit, push and/or pull for at least six of eight hours each out of an eight-hour workday.  He can stand for a total of two hours and walk for a total of two hours during an eight-hour workday.  He should be allowed a sit/stand option while working.  He can lift/carry 20 pounds occasionally (up to 1/3 of an eight-hour workday) and 10 pounds frequently (up to 2/3 of an eight-hour workday).  He can individually climb ramps/stairs, balance, kneel, crouch, and crawl for less than 1/3 of an eight-hour workday.  He should avoid concentrated exposure to hazardous work

claimant must sit for approximately six hours a day. (Tr. 14-15.) Because he must sit for large portions of the day, Gaskin contends that the ALJ should have found him limited to sedentary work, and applying the sedentary grid section corresponding to his age and experience, he should be found disabled. (Doc. 7 at 12 (citing Grid Rule 201.10).)

Gaskin does not contest his ability to satisfy the remainder of the light work requirements: "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR § 404.1567(b). However, standing and walking are generally considered to be major requirements for light work. Unlike sedentary work, light work normally "requires standing up to six hours a day." CAROLYN A. KUBITSCHEK & JON C. DUBIN, SOCIAL SECURITY DISABILITY LAW AND PROCEDURE IN FEDERAL COURT § 3:53 (2012 ed.). Indeed, "[s]ince many unskilled light jobs are performed at specified work stations, the ability to stand is . . . important for light work", and "[r]elatively few unskilled [light work] jobs can be performed while

---

environments where a lack of mobility and balance might place him or others in danger.

(Tr. 14-15.)

seated."  *Id.*; SSR 83-12 at *4 ("Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.").

Nevertheless, courts have cautioned that the inability to meet the stand and walk requirements does not necessarily preclude a claimant from performing light work:

> SSR 83-12 does not endeavor to decide that there can *never* exist significant light jobs with a sit/stand [at will] option.  Rather, it notes that one cannot assume that individuals limited to light work with a sit/stand option can perform the full range of light jobs because many, if not most, light jobs do not afford an employee the option to sit or stand at will.  It accordingly directs the SSA in such cases to obtain the testimony of a vocational specialist concerning whether significant light jobs exist that could accommodate the claimant's special limitations.

*Brooks v. Chater*, 91 F.3d 972, 980-81 (7th Cir. 1996) (emphasis in original).   When a claimant requires a sit-at-will option but meets all of the remaining light work requirements, ALJs are encouraged to consult a vocational expert for assistance to determine whether there are any available light work jobs available in the regional economy with a sit/stand option.  SSR 83-12 at 3.  That is precisely what the ALJ did, and the vocational expert opined that even with Gaskin's limitations he could perform at least three light jobs in the national economy.  (Tr. 19-20 (ALJ's opinion), 63-83 (hr'g tr.).)   Accordingly,  the  Court  rejects

9

claimant's contention that the ALJ erred by failing to assign him to the sedentary work exertional level. *See Smith v. Astrue*, 2011 WL 2650588 at *5 (M.D. Ala. July 6, 2011) (rejecting claimant's contention that she should have been assigned the sedentary level where her capacity was in between the sedentary and light levels and a vocational expert determined that there were light level jobs she could perform); *Brown v. Astrue*, 2010 WL 1257479 at *3-4 (M.D. Fla. Mar. 29, 2010) (same; "The fact that the occupational base is eroded does not necessitate a finding of disability if there exists a significant number of jobs a claimant can perform despite his or her prolonged walking or standing limitations.").

### 2.   *Incomplete Hypothetical*

Gaskin next contends that the ALJ erred by posing an incomplete hypothetical to the vocational expert, since he failed to incorporate a non-exertional limitation noted by Dr. Duffin in his September 10, 2009 RFC assessment form. (Doc. 7 at 13.) Specifically, Dr. Duffin indicated in a check-box form that Gaskin "often" experiences pain severe enough to interfere with his attention and concentration. (Tr. 407.) Claimant essentially reasons that since the ALJ failed to specifically rebut that portion of Dr. Duffin's assessment, the treating physician rule barred

him from disregarding it. *See Winchel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (noting that the ALJ *must* articulate his reasons for disregarding a treating physician's opinion). Hence, he was required to relate Dr. Duffin's assessment to the vocational expert in his hypothetical, and his failure to do so entirely undermines the expert's opinion. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."). Absent that evidence, Gaskin contends that the ALJ erred by finding that Gaskin retained the residual functional capacity to perform light work. (Doc. 7 at 13-14.)

The ALJ explicitly considered Dr. Duffin's RFC assessment and gave it "significant weight . . . because he is the claimant's treating orthopedic physician, and his conclusions are consistent with the objective medical findings and the claimant's ongoing intensive treatment." (Tr. 18.) However, the ALJ entirely focused on the orthopedist's assessment of Gaskin's *physical* abilities. (Tr. 17-18.) For instance, he accepted the doctor's opinion that Gaskin could: lift 10 pounds frequently, 20 pounds occasionally, and 50 pounds rarely; has no

significant limitations in repetitive reaching, handling, or fingering; can sit for six hours in an eight hour work day; can stand or walk for forty-five minutes at a time for about two hours in an eight hour day; and does not need to elevate his legs, use an assistive device to stand or walk, or take unscheduled breaks.   (Tr. 17.)   He never directly addressed Dr. Duffin's contention that Gaskin "often" experienced severe pain that would interfere with concentration and attention; even the Commissioner admits that "the ALJ could have provided a more thorough decision by discussing that particular aspect of Dr. Duffin's opinion."[2]   (Doc. 8 at 18-19.)

---

[2] The Commissioner would have the Court try the case *de novo*. (Doc. 8 at 14-19.)  After stepping through the medical evidence before the ALJ, the Commissioner concludes that "Dr. Duffin's opinion regarding the effect of Plaintiff's alleged pain on his attention and concentrate[ion] was not entitled to any weight given the evidence from before Plaintiff's date last insured." (*Id.* at 17.)  This Court, however, cannot engage in a post-hoc analysis creating reasons out of whole cloth to support an inference that the ALJ properly discounted Dr. Duffin's pain assessment; nor can it disregard the ALJ's analysis entirely and reach its own conclusions as to the proper weight of the evidence. *E.g., Cook v. Astrue*, 2009 WL 464190 at *5 (S.D. Ga. Feb. 24, 2009).  Instead, it must "review the decision *as delivered by the ALJ*," and when the ALJ fails to explain the weight given particular evidence, reversal in mandated, because the Court cannot "perform any meaningful judicial review." *Id.* (emphasis added) (citing *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985)); *e.g.* KUBITSCHEK & DUBIN, *supra*, § 8:2 (collecting cases holding that a court may neither reweigh the evidence in the record nor substitute its judgment for the ALJ's.).

Alternatively, the Commissioner contends that any error was harmless because the evidence preponderates against Dr. Duffin's assessment. (Doc. 8 at 19.)  Harmless error analysis cannot be applied in such a way -- it only applies where substantial evidence supports the ALJ's conclusions and some *legal* error occurred

Nevertheless, reversal is not mandated here. A detailed inspection of Dr. Duffin's RFC assessment reveals that his check-marked pain severity assessment did not stand in a vacuum, as claimant would have the Court believe. Instead, it was one of a series of questions regarding claimant's pain. Dr. Duffin explained, for instance, that Gaskin's *knee* pain worsened upon prolonged standing, walking, squatting or bending, but his *shoulder* pain was "intermittently" severe and restricted lifting and reaching. (Tr. 406-407.) The question at issue, whether Gaskin suffered severe symptoms likely to interfere with attention and concentration, plainly covered both impairments, but his shoulder pain is a non-issue since there were no medical signs or laboratory findings substantiating the existence of a shoulder impairment prior to Gaskin's last insured date. (Tr. 14.)

---

that was not case dispositive. *E.g., Carson v. Comm. of Soc. Sec. Admin.*, 300 F. App'x 741, 746 n.3 (11th Cir. 2008) (applying harmless error analysis to social security appeals where the record does not indicate that a legal error "affected the ALJ's decision"); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (same); *see also Shinseki v. Sanders*, 556 U.S. 396, 407-12 (2009) (explaining harmless error in two Veterans Administration cases). Assuming that the ALJ failed to include crucial information in his hypothetical to the vocational expert, it would amount to more than a mere legal error, for where an ALJ fails to completely weigh a treating physician's opinion, the expert is precluded from rendering a valid opinion as to claimant's capacity to work.

Here, the Court need not guess at what was in Dr. Duffin's mind. He explained that Gaskin's knee pain was not severe unless aggravated by prolonged activity.  In fact, Gaskin could stand and walk 1-2 blocks *without experiencing severe pain*.  (Tr. 408.)  Similarly, while Duffin notes that Gaskin could stand/walk "about 2 hours," he could sit for "at least 8 hours" without taking walking breaks or even elevating his legs.[3] (*Id.*)  The only caveat is that he had to be able to shift positions at will between sitting and standing.  (*Id.*)  The shoulder, on the other hand, gave intermittent severe pain when reaching or lifting, which is fully consistent with the concentration/attention assessment in the RFC questionnaire.  (Tr. 407.)  It was plainly the irrelevant (for present purposes) shoulder impairment that caused Gaskin to "often" experience pain severe enough to interfere with attention to detail, not knee pain associated with sitting.

The ALJ crafted his hypothetical accordingly, focusing entirely on Dr. Duffin's knee-related assessment:

> If we assume an individual who throughout the period of time in question was closely approaching advanced age, that's between the

---

[3] In fact, the ALJ heavily relied upon Dr. Duffin's pain assessment in rejecting Gaskin's claim that he suffered from debilitating levels of pain.  (Tr. 18.)

14

ages of 50 to 54, inclusive.  He was 51 years old as of the date his last insured expired, and he's currently 53 years of age.  We have an individual with a limited ninth grade education who is able to read, write and perform simple mathematical computations.  In our first hypothetical, our individual's total right knee replacement and degenerative joint disease of the left knee limit him to performing light exertional work activities that never require climbing ladders, ropes, or scaffolding, running or jumping.  He can individually sit, push and/or pull for at least six of eight hours in an eight hour workday.

He can stand for a total of two hours and walk for a total of two hours during an eight hour workday. He should be allowed a sit/stand option while working.   He can lift, carry 20 pounds occasionally, defined as up to a third of an eight hour workday, and 10 pounds frequently, defined as up to two-thirds of an eight hour workday.  He can individually climb ramps, stairs, balance, kneel, crouch and crawl for less than one third of an eight hour workday. He should avoid concentrated exposure to hazardous work environments where a lack of mobility and balance might place either him or others in danger. . . .   Is there any competitive employment that exists in significant numbers in the national economy that such an individual could perform on a regular and sustained basis, that being eight hours a workday, 40 hours a work week, say for a minimum of six to nine months, and that would fall within the light exertional category?

(Tr. 68-69.)   Since the shoulder impairment was not supported by substantial evidence, there was no reason to include it or its related pain limitations in the hypothetical. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  Consequently, this claim fails.

### 3.    *Vocational Expert's Reliability*

Finally, Gaskin contends that the ALJ erred by using "vocational expert testimony that was unreliable and inconsistent with the Dictionary of Occupational Titles [(DOT)] and the Commissioner's regulations." (Doc. 7 at 14.)

The second portion of his claim -- that the expert's testimony was inconsistent with the DOT -- is a non-starter.  In this Circuit, when a vocational expert's testimony conflicts with the DOT, the expert's testimony "trumps" the DOT. *Jones v. Apfel*, 190 F.3d 1224, 1229–30 (11th Cir. 1999); *but see* SSR 00-4p ("Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict.").  Hence, an ALJ may rely upon vocational expert testimony without resolving any conflicts.   *Id*.  Nevertheless, the Social Security Administration promulgated SSR 00-4p after *Jones*, and it requires the ALJ to further explore the matter.  Under that ruling, an ALJ must ask a vocational expert if there is a conflict between the expert's testimony and the DOT.  If there is a conflict, the ALJ must address it in his decision and resolve it.  SSR 00-4p at *1-4.  The ruling, however, does not undo the rule in *Jones*, nor does it "expressly mandate that an ALJ has a duty to

16

independently investigate whether there is a conflict between the VE's testimony and the DOT." *Smith v. Astrue*, 2010 WL 1223879 at *9 (M.D. Fla. Mar. 24, 2010); *Miller v. Comm'r of Soc. Sec.*, 246 F. App'x 660, 662 (11th Cir. 2007) (holding that SSR 00-4p was not binding and that even if there was an inconsistency between the DOT and the vocational expert's testimony, the ALJ did not err by relying upon the testimony of the vocational expert); *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (holding that "[n]othing in SSR-004p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct" and therefore "[b]ecause [the expert] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved."); *Haas v. Barnhart*, 91 F. App'x 942, 947-48 (5th Cir. 2004) (where conflict was not brought to the attention of the ALJ it was not reversible error for the ALJ to rely upon the testimony of the expert); *Gibbons v. Barnhart*, 85 F. App'x 88, 93 (10th Cir.2003) (no error under SSR-004p where the VE did not identify conflicts with the DOT); *see also Lembke v. Barnhart*, 2006 WL 3834104 *15 (W.D. Wis. 2006) (reversal is not warranted where plaintiff identifies a conflict after the hearing but

during the hearing no conflict was identified, so long as the ALJ complied with SSR-004p by asking the VE at the hearing to identify conflicts). Here, the ALJ asked the expert whether there were "any significant differences in the way [the jobs she identified are] currently performed and the way the Dictionary of Occupational Titles described them." (Tr. 70.) She responded that there were not. (*Id.*) He was therefore entitled to rely upon her assessment.[4]

Gaskin also contends that the vocational expert's testimony was unreliable. (Doc. 7 at 14.) As discussed above, a vocational expert's opinion constitutes substantial evidence to support the Commissioner's decision to deny benefits so long as the testimony is reliable (i.e.,

---

[4] To the extent that there is a conflict, Gaskin has not set it forth in a straightforward manner. Instead, he points to several bits of "flawed VE testimony" and invites the Court to sort out why these flaws amount to a discrepancy with the DOT. (Doc. 7 at 16-19.) The only relevant discrepancy apparent to the Court is the expert's testimony that certain light work jobs can be performed while sitting. Even so, the DOT defines jobs based upon their "maximum requirements," not necessarily their actual requirements. SSR 00-4p at *3. The expert here testified that she had seen product assembly and table worker jobs available in the regional economy with a sit/stand option. (Tr. 78-81.) Moreover, gate attendants, parking lot attendants, and ticket takers generally enjoy a sit/stand option. (Tr. 81.) Any error here was at worst harmless. *See Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2004) (reversal not required where the expert's "clear and unchallenged testimony that [claimant] could perform the identified jobs" with his impairments); *Jones v. Barnhart*, 964 F.3d 501, 506 n.6 (3d Cir. 2004) ("this Court has not adopted a general rule that conflict between a VE's testimony and the DOT necessarily requires reversal."); *Coleman v. Astrue*, 269 F. App'x 596, 602 (7th Cir. 2008) (harmless error to fail to explore conflict).

trustworthy data used in response to a valid hypothetical question containing all of a claimant's impairments).   KUBITSCHEK & DUBIN, *supra*, § 3:103.   It is unclear, however, precisely what reliability standards are applicable, since the Eleventh Circuit has yet to address the issue in a published opinion.   Claimant would have the Court apply the Seventh Circuit's standard, which requires an ALJ to conduct some sort of rudimentary Fed. R. Evid. 702[5] inquiry whenever he has reason to suspect an expert's conclusions are not reliable.   (Doc. 11 at 6 (citing *McKinnie v. Barnhart*, 368 F.3d 907, 910-11 (7th Cir. 2003)).)   But in an unpublished opinion, the Eleventh Circuit has indicated its acceptance of the Ninth Circuit's rival standard.   Under that approach, a vocational expert's recognized expertise provides the necessary foundation for his or her testimony and no additional foundation is required.   *Leonard v. Comm'r of Soc. Sec.*, 409 F. App'x 298, 301 (11th Cir. 2011) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *see also Pritchett v. Astrue*, 2009 WL 4730326 at *3 (M.D. Ga. Dec. 4, 2009)

---

[5] Under Rule 702, an witness "qualified as an expert by knowledge , skill, experience, training, or education may testify in the form of an opinion" if his expertise is helpful to the trier of fact, it is based on "sufficient facts or data," it is the "product of reliable principles and methods," and the "expert has reliable applied the principles and methods to the facts of the case."

(recognizing circuit split between Seventh and Ninth Circuits  but ultimately rejecting the Seventh Circuit approach); *Dugan v. Comm'r Soc. Sec. Admin.*, 2011 WL 2009465 at *6-7 (D. Vt. May 23, 2011) (same).[6]   The undersigned rejects the Seventh Circuit's heightened evidentiary standard governing vocational expert reliability.  *Pritchett*, 2009 WL 4730326 at *4.  Instead, the Court "must simply review the ALJ's conclusions to determine whether they are supported by substantial evidence." *Id.*

Here, the ALJ relied upon the vocational expert's assessment that claimant could work as a Small Products Assembler I (1,200 available in

---

[6] Claimant cites to *Manser v. Barnhart*, No. CV403-140, doc. 16 (S.D. Ga. July 30, 2004), suggesting that this Court has previously applied the Seventh Circuit's standard.  (Doc. 7 at 15 (citing *Donahue v. Barhart*, 279 F.3d 441, 446-47 (7th Cir. 2002)).)  In *Manser*, claimant's attorney challenged an expert's job availability calculations at the hearing, but the ALJ never resolved the issue. *Manser*, doc. 16 at 24.  The Court directed a remand because there was a substantial question as to whether the calculations were valid and amounted to substantial evidence. *Id.*  That case was decided before *Leonard* or *Bayliss*, and the Court now explicitly rejects any reliance upon the Seventh Circuit's reliability standards.

*Manser* was a very different case.  It would mandate a remand even under basic substantial evidence review.  The *Manser* expert identified only a *single* occupation plaintiff retained the capacity to perform, but when counsel "raised a valid issue concerning the VE's methodology," the ALJ failed to follow through by requiring the expert to explain his reasoning. *Id.*  The ALJ, then, blithely relied upon an expert despite the presence of a serious question as to the expert's reasoning.  Here, claimant has never explicitly challenged the expert's methodology.  Instead, he has submitted several "faults" which he contends add up to an "unreliable" expert. (Doc. 7 at 16-19.)

the regional economy), Gate Attendant (980), or Table Worker (1,200). (Tr. 19-20.) The expert explained that she used O*Net, an occupational database developed under sponsorship of the United States Department of Labor, to arrive at the number of available positions fitting the DOT descriptions listed above.[7] (Tr. 74.) She also affirmatively stated that all small products assemblers and gate attendants would be permitted a sit/stand option, though she never explicitly stated that all table workers could sit; instead, she explained that she had seen employees sitting at certain factories. (Tr. 75-76, 80-81.)

Claimant's discussion of "flawed VE testimony" begins with an assertion that the vocational expert flubbed a question about the difference between light and sedentary employment. (Doc. 7 at 16.) When given a hypothetical job description requiring standing and walking for six to eight hours at a time, she stated that it could still qualify as sedentary employment. (Tr. 82.) She was plainly wrong under the regulatory framework.[8] The issue, however, is not whether the

---

[7] *See* About O*NET, *available at* http://www.onetcenter.org/overview.html (last visited Apr. 16, 2012).

[8] Similarly, claimant points to the expert's difficulties in determining when the Small Products Assembler job description had last been updated. (Doc. 7 at 17.) When asked, she stated that she believed it had last been updated upon the most

expert could properly delineate between specific exertional levels, but whether she could state with certainty that jobs existed in the national economy that claimant could perform based upon the impairments listed in the ALJ's hypothetical.  While her response might indicate a lack of familiarity with certain portions of the vast regulatory framework at play, the Court is not convinced that it reflects an inability to provide detailed information about the regional and national economies.

Next, Gaskin claims that the expert admitted that she did not know whether the O*Net job titles corresponded with the job titles referenced in the DOT. (Doc. 7 at 17.)  A review of the record shows that he is overstating his case.  Here is the relevant exchange:

Q Okay. What was the source of the number you came up with regionally, 1,200 of these positions [(Small Products Assembler I)]?

A From my 0 Net.

Q Okay. Does 0 Net actually provide numbers?

A Yeah. I don't have that accessible. I have my information that I've taken from that.

recent publication of the DOT, in 1991. (Tr. 72.)  The ALJ advised her to look at the "DLU down at the bottom," and she responded that it had been updated in 1982. (*Id.*)  Counsel asked her what DLU stood for, and she stated "date last updated." (Tr. 72.)  The Court is entirely untroubled by this exchange.

Q Okay. Do the 0 Net job titles correspond or do they use the same job title numbers as the DOT?

A No, they don't.

Q Okay. Do you know whether the job title in the O Net is the same job as the small products assembler job listed in the DOT?

A I can't say that right now. I don't have that in front of me right now. Is it something I can explore and get back to you on?

(Tr. 74.)  Claimant contends that the expert could not state whether the O*Net jobs corresponded to the relevant DOT listings.  (Doc. 7 at 17.)  It is readily apparent, however, that claimant asked only about the Small Products Assembler I job, not all three jobs.  More importantly, however, claimant's question could easily be misunderstood. Taken in context, the expert could have concluded that Gaskin wanted to know whether the actual job *name* was the same in both O*Net and the DOT, not whether the job requirements were functionally the same.  After all, the expert had already testified that there were 1,200 Small Products Assembler I jobs, as defined under the DOT.  (Tr. 70.)  It appears to have been a simple misunderstanding.  The Court rejects claimant's assertion that the "VE could not state whether or not the 1,200 O-Net jobs were in fact the same job as the 'Small Products Assembler,'" since that *is not* the question that he asked her. (Doc. 11 at 8.)

23

Moving on, Gaskin contends that the expert described the wrong job when explaining the position of gate attendant.  (Doc. 7 at 17.)  The expert relied upon DOT number 344.667-010, which covers ticket takers, not gate guards.  When claimant's attorney asked about the position, she stated:

> Example that comes to mind would be at a gated community, apartment complex or housing, where the cars would come in and they would approve it. You know, military installation. I know they do that Ft. McPherson. . . .  And it's also could be classified as ticket taker as well into like parks, like Six Flags.  People coming in, taking tickets, making sure that, checking pocketbooks, et cetera. They can distribute the work checks, count records and tickets. . . . Another area was movie theater, the movie theaters.  They have people that take the tickets, let the people in and out.

(Tr. 76.)  The trouble is, the DOT number she relied upon only covered ticket takers, not gate guards; gate guards fall under a different title, 372.667-030.  While she clearly conflated the two sections, this error is inconsequential.  Gaskin does not contest that she provided the ticket taker title number and explained that he retained the ability, even with his impairments, to work under that title provision.

Finally, Gaskin claims that the expert admitted that she had never observed a small product assembler or table worker sitting at work in a competitive employment environment; she had only seen them sitting in

24

non-competitive jobs with the Easter Seals and Goodwill.  (Doc. 7 at 17.)
The record shows otherwise.  The expert explained, for instance, that the
Easter Seals job was *not* completely sheltered.  The factory hired people
at minimum wage, and people working in certain areas of the factory
were permitted to sit.   (Tr. 74.)  Moreover, she explained that most small
products assembly jobs generally allow a person to sit or stand at will
"and [she] ha[d] witnessed that" at a competitive employment factory in
Macon, Georgia, but she couldn't recall the name of the specific factory.
(Tr. 75.)    And she had also seen table work performed by seated
employees.  (Tr. 80.)

In sum, claimant has cherry-picked several minor errors or
misstatements in the vocational expert's testimony in order to
undermine her conclusions.  While the expert's testimony was far from
perfect, the Court accepts that it was sufficiently supported that the
ALJ's reliance was acceptable.   In other words, the ALJ's opinion is
supported by substantial evidence.

## III.  CONCLUSION

Based on the foregoing, the Commissioner's decision denying benefits should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this ___24th___ day of April 2012.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

26